The case for argument is 17-2528, Brown v. United States.  Other provisions in that regulation provide some context. It talks about, in paragraph five, if a seizure should recur during a later attempt to withdraw medication, then the decision to refer to a PEB is at the discretion of the physician or of the MEB. Also there's, in paragraph six of that regulation, some language about if a soldier remains seizure-free for 36 months. Can I ask you about another document? It's in the appendix at page 324. This one's dated 1999, so it's like over three years after that original 1996 document relying on purportedly showing prescription of 300 milligrams. This document, this page at 324, dated August 1999, seems to, at the bottom, you see it says something like Dilantin 300 milligrams, now 300 milligrams tonight, 300 milligrams tomorrow, something like that. It looks like maybe it's a new prescription, I don't know. But that, this document seems to be a little bit before the neurologist's report that is dated 2000. So, have you considered this and what this is saying here, and whether this is changing his prescription? It seems to be another indication that he should have been taking 300 milligrams and wasn't for whatever reason, whether it was a misunderstanding or a failure to communicate. Or is this a new prescription? I mean, how do you know that this means that he should have known, or should have been given, or that he was given, let me straighten that out, that he was given 300 milligrams per day as early as 1996 for the initial treatment? It's not clear that it's a new prescription or not. I couldn't, I can't, as your Honor is unable to conclude, as I am also unable to conclude. Ultimately, we know that once he was taking the 300 milligrams, once he was actually taking it, because even if your Honor, if that wasn't, let's assume it was a new prescription then, it appears that he didn't take the prescription as prescribed several months later when he had his seizure in February of 2000. It was discovered that he had been taking 100, which was, I think, the document you just showed me was in late 1999, so it was several months before. So that's our position on this specific issue, is that for the seizure, that once he was treated, once he was following the treatment, once the treatment was initiated, which is the language in the regulation, he was seizure-free. And that document's in the record demonstrate that. So that's the position of the government on the seizure issue, is that once the treatment had been initiated... But if, in fact, he had been prescribed 100, and then he had another seizure, under my reading of the regulation, he gets to go move up to the MEB. The doctor, if it's four months later, the doctor, the neurologist doesn't, I mean, the whole point of this is that the neurologist doesn't get to continually experiment on the correct dosage. You get kind of one try, and if that doesn't work, you move you up to the MEB, right? There is a period of whether there's a trial and error period that is contemplated in the regulations, and after that period's over, he should be referred. This is an important point also. The Corrections Board, the Barnett case, which is cited in our brief, states that the Corrections Board essentially, if a service member doesn't have an MEB or PEB, that the Corrections Board can give that service member the review that a PEB would have provided, and it could take the place of the PEB. So here, when Mr. Brown went to the Corrections Board, the Corrections Board considered all the evidence that was presented to it, all the medical records that were provided, decided that he was fit for duty at the time that he had been separated, which was several years, 13 years before, because this Corrections Board process didn't start for about 13 years after the service ended. So we know that he was given this review by the Corrections Board, which is essentially what he would have gotten from a PEB initially. Barnett tells us that. We also know that this court reviews these decisions de novo, and so we think the trial court is correct, and we think even if you have a different basis upon which you would want to rule from the trial court based upon the record, of course, under the law, you can do that as long as the record supports such a basis, because this is de novo review. And there is no evidence in the record here, as the trial court correctly observed, to show that he's unfit for duty, and ultimately the fitness question is what is at issue, because if he's fit for duty, he's not entitled to disability compensation. So the Corrections Board made that determination. And as to the shoulder, our position is that the Corrections Board addressed that issue to the extent it was raised by Mr. Brown. He didn't raise it as a separate basis for unfitness. It was raised in the context of this case, but he focused on his petitions to the Corrections Board, and he filed three petitions to the Corrections Board. All of them focused on the seizure condition and to the extent the shoulder condition was referenced. It was a secondary point. The ultimate decision of the Corrections Board on reconsideration, it addressed the shoulder condition and discussed it at some length and decided that within the profiles, the limitations of his duty that were given to him because of his various conditions that he was fit for duty. And that's a decision that the Army has afforded deference for that decision, as the cases say. And so... I'm sorry, just to clarify, what is the standard you think that we use to determine whether or not there was waiver? Do you think that's a question of fact or law? And if it, which one, what is the appropriate standard of review that you believe we ought to apply? For waiver, the trial court decision on that, it would be an abusive discretion standard, I believe, Your Honor. But here, I get our... The waiver issue, I think, is not as important because ultimately, the Corrections Board addressed all the claims that were presented to it, and it discussed the shoulder. It didn't assess it at length like it did the seizure, but it did... Yes, Your Honor. You're basing the waiver argument, as I understand it, it has to be based on the fact he never raised it at the Board. So you're trying to have it both ways. He waived it because if he had raised it appropriately at the Board, then there would be no waiver. Yes, Your Honor. So you're arguing, well, in the alternative, one, it was waived, but even if it wasn't waived, they dealt with it. It's kind of... I don't know that it seems right for you to get to have these alternative arguments presented. I understand your frustration. I think this case, from the beginning, there were a lot of different claims, and over time, many of them have fallen off. And so this... There was a Hernia claim at the trial court that was deemed waived that wasn't raised here. There were other... Another claim to the trial court that he withdrew and waived. Right, I understand that. And so... I mean, is the government's position that he raised it at the Board, and the Board dealt with it, and they want us to affirm on it instead of on it? I don't mean to waffle, but I guess to the extent he raised his shoulder in his filings with the Board, the Board addressed his shoulder to some degree. Whether it's squarely addressed, whether or not the shoulder could provide by itself... We can't possibly affirm that if it was a merits determination, because the trial court said it was waived. So she didn't deal with it at all. So at a minimum, under that theory, we'd still have to send it back to the Court of Claims, right? Or... She filed a waiver. Right? If you think that he didn't waive this claim, I suppose that is true. On page 132 of the appendix, it refers to seizures requiring surgeries. Do you know what those surgeries are? Does it have to do with his shoulder at all? That's my understanding, yes. It's a shoulder surgery. Yes. I believe his first shoulder dislocation occurred from a seizure. And that's in the application for correction of military record. I think it's maybe one of them, one of the applications. Okay. Okay. Thank you. Thank you. If I may, I just want to address the appendix 324, the question as to whether or not that document is a new prescription or not. I point out to the Court that that's the emergency care and treatment record from when he fell and hit his face on surgery for a seizure. And at the bottom, it says instructions to patient dated that date. So to me, that suggests strongly that that's a new direction as to what medication to take. And it's also from Dr. Pogliar's, the neurologist at the bottom, who's directing that from the emergency department after he fell. Is that the same neurologist that's on the other document or no? No, Your Honor, different. I believe the second one clearing him was Lieutenant Colonel Moss, I believe. My colleague raises the point of the trial court's finding that Mr. Brown never showed that he was unfit. And there's a really important distinction here between unfitness and fails retention standards. Failing retention standards is what gets you to the MEB. The MEB, once it convenes, looks at your conditions and basically documents them to be forwarded to the PEB. Now, the PEB is the agency, well, it's a sub-agency, the agency that does the unfitness determination. So Mr. Brown wasn't asking for an unfit finding. He was asking for a medical review or an MEB. So the idea that he didn't show that he was unfit just really doesn't gel or fit into the applications. And just then briefly on the shoulders not being raised as being unfit, he talked about he couldn't do pushups. He couldn't do any overhead work. This is a soldier who's an E6 squad leader in the Army with communications gear, which involves putting up the antennas, lifting, it's physical work. So that by itself does actually indicate both failing retention standards but also is an indication of unfitness because if you can't lift things up as a communications sergeant, you're going to be unfit. And just to address exactly the unfit, that's from Army Regulation 635-40, which is the question of reasonableness of the ability to perform the duties expected of a soldier of that grade, rank, rating, or office, which basically means you're ranking what job you have in the military. So you can have these MEB conditions that are just a laundry list and applies to every soldier. But when you get over to the PAB, it really depends on your job because if you're an admin soldier and you're in the office doing admin work all day, well, that's a different degree of physical requirements than an infantry soldier in the field running with a ruck and a rifle and doing all kinds of physical activity. If the Court has any more questions. Thank you. Thank you, Your Honor. Thank you both sides, and the case is submitted. Final case for argument is…